## The People of the State of New York, *vs.* Alonzo Snyder.

Where it is proved, in an action of ejectment brought by the people, that an individual under whom the defendant claims title, was not an alien, but a naturalized citizen, both at the time of the grant to him and of his grant to the defendant's grantor, the people, in their sovereign capacity, should be presumed to have known that fact; especially where it appears that such person had represented, and exercised, their sovereignty, both in the legislative and judicial departments of the government for a number of years.

The treaty between the United States and the government of Great Britain, commonly known as Jay's treaty, concluded and ratified by our government in 1794, expressly provided that British subjects, then holding lands in the United States, should continue to hold them according to the nature and tenure of their respective estates and titles in such lands, and might grant, sell or devise the same, as they might respectively choose to do. When this treaty was ratified, it became a part of the supreme law of the land, and rendered the title of every alien British subject, to lands in every part of the United States, then held, not only valid, but alienable by him, the same as though he had been a native born or naturalized citizen.

The act of the legislature of this state, passed April 20, 1798, expressly authorized the conveyance of lands to aliens, and made conveyances to them valid to vest the estate thereby granted, in such alien, "to have and to hold the same to his, her or their heirs and assigns forever, any plea of alienism to the contrary notwithstanding." (4 *N. Y. Stat. at Large*, 294.)

Under this statute Sir William Pulteney, who was an alien, took and held a perfectly valid title to all the lands embraced in the deed to him from Charles Williamson and wife, dated March 31, 1801; he having complied, fully, with the conditions prescribed in the second section of the aforesaid act, and had his conveyance recorded, in the office of the secretary of state, within twelve months after the date thereof.

The complete and perfect validity of the title, in Sir William Pulteney, has been often affirmed by the courts of this state; and the whole question having been carefully examined, and the validity of the title distinctly affirmed, in the case of *The Duke of Cumberland* v. *Graves*, (7 *N. Y. Rep.* 305,) that decision, by the court of last resort, ought to put the question of the validity of such title at rest, forever. *Per* JOHNSON, J.

Where, in an action of ejectment brought by the people, it was admitted by the pleadings that a third person held the title of the premises, in 1792, and that consequently it was then out of the plaintiffs, if they had ever been invested with it; *Held* that the mere fact that the lands in question were at the time of commencing the action unoccupied and uncultivated, raised no presumption whatever that the plaintiffs had become re-invested with such title.

The presumption in such a case is, that the title remains out of the plaintiffs, until the contrary is shown, affirmatively. The burden of proving reinvest-

ment is on the plaintiffs. The fact that the land is wild, and not actually occupied by any one, works no forfeiture of title, and no escheat. Nor does it raise any presumption in the people's favor, where they are shown to have been once divested.

In an action of ejectment, brought by the people, the plaintiffs cannot recover upon the ground that the Indian title to the lands in question has never been extinguished; where it is not pretended that the state has ever acquired the Indian title, by any purchase or treaty, but on the contrary, it is claimed that the fee of such lands is still in the six nations of Indians.

THIS is an action of ejectment commenced in November, 1864, to recover a parcel of land in Livingston county. The complaint contains five counts, the first and fifth being general. The second, third and fourth counts allege that the premises in question were, by regular conveyances, conveyed to the persons named in the several counts, and that such persons were aliens, wherefore the said premises escheated to the plaintiffs. The defendant, in his answer, alleges that he entered into the possession of said lands as tenant, under William, Earl of Craven, Alexander Oswald, and Edmund Bucknall Estcourt, citizens of the United Kingdom of Great Britain and Ireland; that his possession is in all respects just and lawful; and that there has been an adverse possession by him and his grantors, for more than forty years. The cause was tried at the circuit, in Livingston county, in October, 1866, before Justice WELLES and a jury. The court ordered a verdict for the defendant, upon which a judgment was duly perfected for $309.03 costs, from which the plaintiffs appealed to the general term.

*Scott Lord,* for the appellants.

*D. Rumsey,* for the respondent.

*By the Court,* JOHNSON, J. The action is ejectment, brought by the plaintiffs to recover possession from the defendant, of about 110 acres of land situate in the

The People *v.* Snyder.

town of Springwater in the county of Livingston. It is alleged in the complaint, that the defendant entered into possession of the premises in question, under the authority of William, Earl of Craven, and others, in pursuance of a contract made with them, for the purchase thereof. The defendant in his answer, admits that he is in possession under the authority of the said William, Earl of Craven, and others, as alleged in the complaint, and claims that they are the owners in fee simple, and that his possession is in all respects just and lawful.

The theory upon which the action has been brought and is sought to be maintained, as will be seen by looking at the several counts, or causes of action, set forth in the complaint, is, that this land, together with all other lands belonging to what is familiarly known as the Pulteney estate, escheated, and the title became vested in the people of this state, upon the death of Charles Williamson, on or about the 31st of December, 1807. It is alleged in the complaint, that on the 20th of February, 1795, Robert Morris, a citizen of Philadelphia, in the state of Pennsylvania, was seised and possessed of said premises, and that on that day he conveyed them to the said Charles Williamson, who was not, at that time, a citizen of the United States, but a subject owing allegiance to the king of Great Britain, &c. It is admitted in the answer that Morris held the land in fee simple, under a conveyance from Nathaniel Gorham and Oliver Phelps, and that he conveyed the same in fee simple to the said Charles Williamson, and that said Williamson conveyed the same by deed in fee simple on the 31st of March, 1801, to Sir William Pulteney. It seems to stand admitted, therefore, by the pleadings, that the title to the premises in question, was out of the plaintiffs, and in certain individuals, at the time of the conveyance to Williamson, and prior thereto, and that Williamson conveyed all his right and title to Sir William Pulteney in 1801. This is alleged in the complaint and admitted

in the answer, and must be taken to be entirely true for the purposes of this action. It was proved upon the trial that Williamson was not an alien at the date of the conveyance to him by Morris, but was a naturalized citizen, having been naturalized in the city of Philadelphia on the 9th of January, 1792. He was therefore capable of taking and holding real estate by virtue of his naturalization, independent of any other question, and of conveying and transmitting the same. The people of this state took no title by reason of his death. It is a part of the history of this state, that Charles Williamson was member of our state legislature representing the counties of Ontario and Steuben in the assembly, for four consecutive years, and sessions, from and including 1796, to and including 1800. He was also first judge of Steuben county from 1796 to 1803 continuously. The alleged alienage of Charles Williamson, and the escheat of these lands to the state upon his death is, I think, the only new feature in this case which distinguishes it, in any material respect, from the multitude of other cases which have come before our courts, during the last half century, in which attempts have been made with more or less vigor and assurance, to assail and overthrow the title vested in Sir William Pulteney by the conveyance to him from Williamson. It turns out as matter of fact, that Williamson was not an alien, but a naturalized citizen, both at the time of the grant to him and of his grant to Sir William Pulteney. This fact the people in their sovereign capacity, should be presumed to have known; especially as it appears that he had represented, and exercised, their sovereignty, both in the legislative and judicial departments of the government for a number of years.

But even if it should be conceded, contrary to the clearly established fact, that Williamson was an alien, never naturalized, such fact would not in the least degree affect the validity of Sir William Pulteney's title, derived through

The People *v.* Snyder.

Williamson's grant. That grant was made in March, 1801. Williamson derived his title from Robert Morris, who is admitted to have had a title in fee simple, in April, 1792. The treaty between the United States and the government of Great Britain, commonly known as Jay's treaty, was concluded, and ratified by our government in 1794. By that treaty it is expressly provided that British subjects, then holding lands in the United States, shall continue to hold them according to the nature and tenure of their respective estates and titles in such lands, and may grant, sell or devise the same as they may respectively choose to do. The same rights were accorded to citizens of the United States residing in Great Britain. When this treaty was ratified, it became a part of the supreme law of the land, and rendered the title of every alien British subject to lands in every part of the United States, then held, not only valid, but alienable by him, the same as though he had been a native born, or naturalized citizen. Our statute, of this state, passed April 2, 1798, expressly authorized the conveyance of lands to aliens and made conveyances to them valid to vest the estate thereby granted, in such alien, " to have and to hold the same, to his, her, or their heirs and assigns forever, any plea of alienism to the contrary notwithstanding." (4 *N. Y. Stat. at Large*, 294.) Under this statute Sir William Pulteney, who was an alien, took and held a perfectly valid title to all the lands embraced in Williamson's deed to him. He complied fully with the conditions prescribed in the second section of the aforesaid act, and had his conveyance recorded, in the office of the secretary of state, within twelve months after the date thereof. The complete and perfect validity of this title, in Sir William Pulteney, has been so often affirmed by our courts in this state, that it would be a mere waste of time to go over the argument. The whole question was carefully examined, and the

validity of the title distinctly affirmed, in the case of *Duke of Cumberland* v. *Graves*, (3 *Seld.* 305.)

Aside from the alleged alienism of Williamson, which is untrue, and wholly immaterial if true, there is nothing new in this case to distinguish it from the case above referred to. That decision, by the court of last resort, ought certainly to put the question of the validity of this title at rest forever. It is idle to expect the court to reverse its decision, in a case where the law and the facts are so clearly and conclusively in favor of the unimpeachability of this title.

Until some new and important fact, the existence of which is not yet known, or suspected, shall be discovered and established, tending to invalidate this title, and impeach its integrity, the agitation of the question can be productive of nothing but evil to individuals, and the most serious injury to the peace, prosperity and happiness of the whole community. The continued agitation of such questions, tends most strongly, everywhere and always, to excite feelings of discontent, of distrust, of apprehension for the security of property and possession, fatal to all persevering industry, to all valuable and permanent improvement of lands, and to the general prosperity of the whole country affected by such agitation. Under its influence, many persons, otherwise well and peaceably disposed, are incited to resort to the desperate and fatal expedient of forcible resistance to the execution of the law, and the process of courts.

The lands embraced in the conveyance to Sir William Pulteney, constitute a large and important portion of the territory of this state, and thousands of titles, and the interests of hundreds of thousands of individuals, depend upon the validity of this title, which should not be assailed, and unsettled at this late day, except upon the most clear, urgent and satisfactory grounds. Least of all, should the state, in its sovereign capacity, through its law officers,

The People *v.* Snyder.

upon light grounds, and frivolous or unfounded pretenses, be guilty of encouraging such unprofitable, and such dangerous agitation. It should not be overlooked that the plaintiffs in this action, were originally parties in their organized and sovereign capacity, to this very title, which they now seek to repudiate and destroy. They consented to its transfer to Phelps and Gorham, and have since recognized its validity, by repeated acts of legislation. Upon every principle of justice, and fair honorable dealing, they should consider themselves estopped at this day from advancing any such claim. They have acquiesced in the validity of this title and stood by and permitted thousands to purchase and take title from that source, without interposing any claim, for three quarters of a century.

The courts have always, and in very numerous instances, adjudged the title valid and unimpeachable; and never in a single instance to the contrary. Under such circumstances it seems most extraordinary and difficult to comprehend why the state should now advance a claim, at once so futile and so mischievous in all its bearings and tendencies. Most obviously it is not the true policy of any enlightened state, to unsettle titles to land within its borders, or to create distrust in the minds of the people, in regard to the validity of their titles. The plaintiffs do not make out even the shadow of a title to these lands, or cast the faintest cloud over that under which the defendant claims. It stands admitted upon the face of the pleadings, that Robert Morris held the title in fee in 1792. Of course it was then out of the people of this state, if they had ever been invested with it. This being so, the mere fact that the lands in question in this action, were at the time of the commencement of such action, unoccupied and uncultivated, raises no presumption whatever that the plaintiffs have become reinvested with such title. The presumption, in such a case, is that the title remains out of them, until the contrary is shown affirmatively. The

The People *v.* Snyder.

burden of proving reinvestment was on the plaintiffs, and they show nothing, except that the land is wild, and not actually occupied by any individual. This works no forfeiture of title, and no escheat. Nor does it raise any presumption in the people's favor, where they are shown to have been once divested.

Another point is raised, I think, for the first time in the history of the litigation upon this title, which is that the Indian title to the lands in question has never been extinguished. This seems to be a clear departure from the theory of the complaint, and entirely against the admission in the pleadings, that the title was vested in Robert Morris in 1792; to say nothing of the evidence in the case on the subject of the cession of these lands by the Indians.

It is claimed by the plaintiffs' counsel that the fee of these lands is still in the six nations of Indians. But if this is so, it is not shown how that fact can aid the plaintiffs in the recovery in this action. The state, as is well known, has always extinguished the Indian title to lands within its borders, by purchase, through a treaty, and required individuals to do so. It is not pretended the state has ever acquired the Indian title to these lands by any purchase or treaty, and if it be true that the fee is still in the Indians, I do not see why that is not entirely fatal to the right of recovery in this action. It is not pretended that the territory has been usurped, by the defendant, or those under whom he claims, and the state dispossessed of its right of governmental sovereignty. I do not deem it necessary in this case to decide the question whether the Indian title was an absolute fee, or otherwise, because I am unable to see how that question can affect the rights of the parties to this action. I suppose, however, that no one will contend that the state could maintain an action of ejectment to dispossess the Indians from their lands, in the reservations occupied by them, or against any individual occupying a portion of such lands with the consent of

the Indians. It is clear enough that the Indians surrendered these lands, now in question, and gave up possession under their treaty to the persons under whom this defendant claims. They were never ceded to the people of the state, and the plaintiffs have never before claimed to be owners of the fee.

Several questions were raised in the course of the trial, in regard to the admissibility of evidence offered and received, or offered and rejected, which I shall not here notice in detail. I have examined them all carefully, and do not think any of them well taken. Most of them, if not all, have been raised and decided in the same way repeatedly, and would be considered as settled beyond all doubt or possibility of cavil on any other subject of litigation.

The judgment must, therefore, be affirmed.

[Monroe General Term, September 7, 1868. *E. D. Smith, Johnson* and *J. C. Smith,* Justices.]

